**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA      :

     **v.**      :      **CRIMINAL NO. 25-403-04**

**GEORGIA MALLOY**      :

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its attorneys, David Metcalf, United States Attorney for the Eastern District of Pennsylvania, and Everett R. Witherell and Michael Miller, Assistant United States Attorneys, hereby submits this Sentencing Memorandum. In considering the Section 3553(a) sentencing factors, the government respectfully submits that a sentence within the advisory guidelines range of 30 to 37 months is appropriate, taking into account any additional factors addressed in the supplemental sealed attachment to this sentencing memorandum.

### I.      INTRODUCTION

On September 10, 2025, a federal grand jury sitting in the Eastern District of Pennsylvania returned an eleven-count indictment charging Georgia Malloy and others in connection with the assault of inmate V.H. at the Curran-Fromhold Correctional Facility and the subsequent effort to conceal what occurred.

Defendant Georgia Malloy was charged with conspiracy, in violation of 18 U.S.C. § 371, and two counts of falsification of records, in violation of 18 U.S.C. § 1519. On March 4, 2026, following a six-day jury trial before the Honorable Karen S. Marston, Malloy was found guilty of Counts Six and Seven, both charging falsification of records. She was found not guilty of conspiracy.

Malloy was not inside the cell when V.H. was beaten. But that does not make her conduct minor. Malloy was the correctional lieutenant assigned to investigate the use of force. She was the supervisor of the correctional officers and sergeant involved. Her job was to determine what happened, review the evidence, ensure accuracy, and report the truth. Instead, she falsified official investigative reports, minimized the force used against V.H., exaggerated V.H.'s aggressiveness, and falsely concealed Sergeant Ronald Granville's use of force.

That conduct mattered. In a correctional setting, assaults and excessive force are often uncovered only through accurate reporting, honest supervision, and meaningful internal review. When the lieutenant responsible for investigating a serious use of force falsifies the investigation, she does more than submit inaccurate paperwork. She protects unlawful violence, undermines accountability, and sends a message to subordinate officers that force can be hidden if the right people are willing to lie. For those reasons, the government respectfully requests a sentence within the advisory guideline range of 30 to 37 months

## II.    FACTS OF THE CASE

The Philadelphia Department of Prisons was responsible for operating Philadelphia's jails and for the care, custody, and safety of inmates housed at those facilities, including the Curran-Fromhold Correctional Facility. PSR ¶ 11. Jahaan Andrews, Oneil Murray, and Mumin Hart worked as correctional officers at CFCF. PSR ¶ 12. Ronald Granville served as a correctional sergeant. Georgia Malloy served as a correctional lieutenant. As lieutenant, Malloy was the supervisor of Andrews, Murray, Hart, and Sergeant Granville. PSR ¶ 12.

V.H. was an inmate housed at CFCF awaiting resolution of criminal charges. On October 5, 2020, V.H. was involved in a fight with another inmate regarding telephone usage. He was

moved to another pod and locked in a cell. As part of punitive measures, V.H. was supposed to be switched from his usual jumpsuit into a jumpsuit of a different color. PSR ¶ 14.

On October 6, 2020, correctional staff discovered that V.H. was still wearing his usual jumpsuit. He was detained in a holding room. Andrews and V.H. argued through the window of the locked door, and it was decided that V.H. would be strip searched and that his cell would be searched for contraband. The search was to be conducted under the supervision of Sergeant Granville. PSR ¶ 15.

At approximately 9:00 p.m., Sergeant Granville, Andrews, Murray, Hart, and another correctional officer escorted V.H. to his cell to conduct the strip search. V.H. was argumentative but complied with the officers' orders. During the search, the officers later claimed that V.H. took a lunging swing at Andrews. In reality, V.H. had flung his boxer shorts over his shoulder. The officers then responded with force. Andrews, Murray, Hart, and Sergeant Granville punched, kicked, and assaulted V.H. PSR ¶ 16.

V.H. suffered serious injuries. He sustained a rib fracture, a facial wound near his eye, a blood clot in his testicle, and an enlarged scrotum. He was transported to Jefferson Torresdale Hospital. Hours after the assault, he still rated his testicular pain as ten out of ten and had difficulty walking. An ultrasound revealed a large hematocele, and V.H. required emergency surgery involving surgical exploration, drainage of nearly a liter of blood, control of hemorrhage, and placement of a drain. He had to wear a scrotal sling after the assault, and his scrotum was permanently scarred. PSR ¶ 17.

Following the use of force incident, Malloy was responsible for investigating what occurred. As the correctional lieutenant, she was required to review the inmate's statement, surveillance video, and reports submitted by the correctional officers who witnessed or participated

in the incident. Any officer who used force was required to submit a Use of Force Form describing the incident and the officer's involvement. Any officer who witnessed another officer use force was required to submit a memorandum describing what was witnessed and who was involved. Malloy's job was to review those forms for completeness and accuracy and then provide a truthful summary in an Investigation Report. Malloy did not do that. PSR ¶ 18.

Instead, on October 10, 2020, Malloy submitted an Investigation Report that exaggerated V.H.'s aggressiveness, significantly downplayed the force used by correctional officers, and falsely claimed that Sergeant Granville did not use force during the incident. The report summarized the incident as essentially involving Andrews punching V.H., Hart assisting Andrews in restraining V.H., and Murray considering the use of pepper spray. The "items of evidence" section also misstated the evidence reviewed: it listed three Use of Force Forms and two memoranda, when the accurate list should have been four Use of Force Forms and one memorandum. The report also failed to note the existence of video evidence. This was not an innocent mistake. It concealed the excessive force used against V.H. and avoided scrutiny of the officers' conduct. PSR ¶ 20.

On October 16, 2020, Malloy submitted a second Investigation Report after a superior officer instructed her to resubmit the report because the first report was inconsistent with V.H.'s injuries and needed to include relevant video segments. Malloy again exaggerated V.H.'s aggressiveness and significantly downplayed the force used by the correctional officers, specifically Sergeant Granville. In submitting the surveillance video, Malloy initially omitted the segment showing Sergeant Granville—the only participant in a white shirt—striking V.H. Only after her superior officer specifically directed her to submit the portion of the video showing Granville hitting V.H. did she submit it. PSR ¶ 21.

Even then, Malloy continued to obscure the truth. When describing the video, she was detailed in some portions but vague during the portion showing Granville striking V.H. For that critical part of the video, Malloy wrote only that "body movement appears inside of the cell." She also continued to report that Granville was merely a witness and had not used force. PSR ¶ 21.

Malloy later submitted additional versions of the Investigation Report, including reports dated October 25 and October 31, 2020. Those later versions changed material facts from the earlier reports. By October 25, the "items of evidence" section had changed to include four Use of Force Forms and one memorandum. Granville, who had originally reported that he only witnessed the incident, later admitted to using hand strikes on V.H. Murray also newly admitted to using hand and leg strikes to take down V.H. Those "leg strikes" included the strike to V.H.'s testicles that caused injuries requiring emergency surgery. PSR ¶¶ 22-24.

Malloy's false reporting did not end with the internal prison paperwork. On May 24, 2022, FBI agents interviewed Malloy and showed her video of the attack. The video clearly showed that only Sergeant Granville was wearing a white shirt and that an individual in a white shirt was punching V.H. When agents asked Malloy whether she could acknowledge that Granville was punching V.H., she first responded that there were no cameras in the cell. She then claimed that anyone could have worn the white shirt because guards could have exchanged shirts inside the cell. Only after making those claims did Malloy finally admit that the video showed Granville punching V.H. She also admitted that she had reviewed the video before submitting her October 16, 2020, Investigation Report, yet she still stated in that report that Granville was merely a witness and did not use force against V.H. PSR ¶ 25.

### III.   SENTENCING CALCULATION

A.    Statutory Maximum Sentences

Counts Six and Seven each charge falsification of records, in violation of 18 U.S.C. § 1519. Each count carries a statutory maximum sentence of 20 years' imprisonment, three years of supervised release, a $250,000 fine, and a $100 special assessment.

The total statutory maximum sentence is 40 years' imprisonment, three years of supervised release, a $500,000 fine, and a $200 special assessment.

B.    Sentencing Guideline Calculation.

The presentence report correctly calculates Malloy's guideline range. The guideline for a violation of 18 U.S.C. § 1519 is USSG §2J1.2. Since the offense involved obstructing the investigation of a criminal offense (deprivation of rights under color of law), the cross reference at USSG §2J1.2(c)(1) is applicable. The cross reference instructs to apply USSG §2X3.1 (accessory after the fact) in respect to that criminal offense, if the resulting offense level is greater than that determined under USSG §2J1.2. In this case, USSG §2X3.1 yields the greater offense level and was used for offense level calculations. Pursuant to USSG §2X3.1(a)(1), the base offense level is 6 levels lower than the total offense level for the underlying offense. The underlying offense is deprivation of rights under color of law, in violation of 18 U.S.C. § 242, which is calculated at USSG §2H1.1. PSR ¶ 31.

Pursuant to USSG §2H1.1(a)(1), the base offense level is the offense level from the guideline for the underlying offense, that is, aggravated assault, which is calculated at USSG §2A2.2 and determined as follows:

- The base offense level is 14, pursuant to USSG §2A2.2(a).

- The victim sustained serious bodily injury; therefore, five levels are added, pursuant

to USSG §2A2.2(b)(3)(B).

- The defendant was a public official at the time of the offense (a PDP correctional lieutenant who worked on behalf of the City of Philadelphia, a local government), and the offense was committed under color of law; therefore, the offense level is increased by six levels, pursuant to USSG §2H1.1(b)(1)(A) and (B).

The resulting total offense level for the underlying offense is 25. The offense level is decreased six levels under USSG §2X3.1(a)(1), for a base offense level of 19. PSR ¶ 31.

Based upon a total offense level of 19 and a criminal history category of I, the guideline imprisonment range is 30 months to 37 months. PSR ¶ 81.

## IV.    ANALYSIS

The Court must consider all the sentencing factors set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).

1. **The nature and circumstances of the offenses and the history and characteristics of the defendant.**

Malloy's offenses were serious. She was not a low-level employee filling out routine paperwork. She was the correctional lieutenant assigned to investigate a serious use of force incident involving a badly injured inmate. She was the supervisor. She was the person responsible for reviewing the evidence, assessing the officers' reports, ensuring that the reports were complete and accurate, and memorializing what occurred. Instead, Malloy falsified the investigation.

The evidence showed that Malloy repeatedly downplayed the force used against V.H., exaggerated V.H.'s aggressiveness, falsely described Granville as only a witness, omitted or obscured critical video evidence, and used vague language to avoid stating the obvious: that Granville, her subordinate sergeant, had struck V.H.

Malloy's role makes her conduct more serious, not less. The officers who assaulted V.H. committed grave crimes. But Malloy's job was to serve as an internal safeguard against exactly that type of abuse. She was not inside the cell when the assault occurred, but she was responsible for what happened next. The investigation was the mechanism by which the prison system was supposed to determine whether force was justified, whether officers had been truthful, and whether an inmate had been abused. Malloy corrupted that process. Correctional supervisors are entrusted with authority over both inmates and subordinate officers. They are expected to model lawful conduct and to insist on truthful reporting. Malloy did the opposite.

Civil rights offenses and related coverups committed in correctional institutions cause harm beyond the individual victim. Inmates are under the control of correctional staff. They cannot investigate their own abuse. They cannot gather the evidence. They cannot compel officers to tell the truth. The system depends on supervisors and investigators to do their jobs honestly. When a

lieutenant falsifies a use of force investigation, the harm is institutional. It undermines accountability, protects unlawful force, and erodes public confidence in the justice system.

Malloy may argue that she did not personally strike V.H. That argument misses the point entirely. The officers in the cell committed the assault, but Malloy was the supervisor charged with investigating it. Her duty was to uncover the truth. Instead, she falsified official reports, concealed critical evidence, and protected the officers responsible for inflicting serious injuries on an inmate. In many respects, misconduct of this kind is particularly dangerous because it transforms the very accountability mechanisms designed to detect abuse into tools for concealing it.

> **2. The need for the sentence imposed to reflect the seriousness of the offenses, to promote respect for the law, and to provide just punishment for the offenses and the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.**

A guideline sentence is necessary to reflect the seriousness of Malloy's conduct, promote respect for the law, and provide just punishment.

This was not a paperwork error. Malloy submitted false official reports about a violent incident that caused V.H. serious injury. She had access to the video. She knew Granville was the only person in a white shirt. She knew the video showed a person in a white shirt striking V.H. She nonetheless reported that Granville was merely a witness and did not use force. When confronted by the FBI, she initially continued to resist the obvious implications of the video before finally admitting what it showed.

The need for general deterrence is especially important. Correctional officers and supervisors must understand that falsifying records to conceal excessive force will result in serious consequences. In the correctional setting, the truth often depends on the integrity of written reports. If supervisors can falsify those reports without meaningful punishment, then the use of force review process becomes meaningless.

This case also illustrates why deterrence is necessary. The assault happened inside a cell, where there were no cameras. The video evidence that did exist was partial and required honest interpretation. The written reports mattered. Malloy's false reports gave a misleading account of the incident, minimized the force used, and concealed Granville's role. A sentence that fails to recognize the seriousness of that conduct would send the wrong message to correctional supervisors, that covering up force is less serious than using force. The coverup is what allows unlawful force to survive.

Specific deterrence is also relevant. Malloy held a position of public trust and abused it. Even if she has no prior criminal history, her conduct reflected a willingness to protect fellow correctional staff at the expense of truth, accountability, and an injured inmate. A guideline sentence is necessary to impress upon Malloy and others that supervisory authority in a jail is not a shield from accountability; it is a reason accountability matters more.

3. **The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

The defendant's needs for educational or vocational training, medical care, or other correctional treatment in the most effective manner can be met by the Bureau of Prisons.

4. **The guidelines and policy statements issued by the Sentencing Commission and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

The advisory guideline range is 30 to 37 months. That range properly accounts for the seriousness of Malloy's obstruction related conduct, her lack of criminal history, and the circumstances of the offense. A sentence within that range would avoid unwarranted disparities among similarly situated defendants and would appropriately distinguish Malloy from defendants who accepted responsibility.

Malloy went to trial and was convicted. She is entitled to exercise that right, and the government does not suggest otherwise. But she has not accepted responsibility. Unlike other defendants in this case, who pled guilty and accepted responsibility at an early stage, Malloy forced the government to prove her guilt at trial and has not demonstrated any recognition of wrongdoing. A guideline sentence would fairly account for her offense conduct, her supervisory role, and the absence of acceptance of responsibility.

## V.    **CONCLUSION**

For the foregoing reasons, and subject to any additional factors in the Sealed Supplement, the government respectfully requests that this Court impose a sentence within the sentencing guidelines range of 30 to 37 months.

Respectfully submitted,

DAVID METCALF
United States Attorney


/s/ *Everett Witherell*
EVERETT R. WITHERELL
Michael Miller
Assistant United States Attorneys


Dated: June 17, 2025

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing was served on the following counsel electronic filing on this date:

Angelo Charles Peruto, Jr., Esquire
2016 Spruce Street
Philadelphia, PA 19103
215-735-1010
Chuck@Peruto.com

*/s/ Everett Witherell*_____
Everett Witherell
Assistant United States Attorney

Dated: June 17, 2025